unexplained and uncontradicted, is sufficient to permit an inference that the transaction under consideration was the result, not necessarily of positive and actual fraud on the part of the respondent, but of an understanding on the part of Mrs. Curtis that she was giving security for money to be advanced to her by him. Such a conclusion might not be inevitable; but, if permissible, it was error to grant a nonsuit. A question of fact was presented, and the learned trial justice was in error in disposing of the case as if it presented only a question of law.

The judgment and order must be reversed, and a new trial granted, with costs to the appellant to abide the event. All concur.

---

POTTER v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Fourth Department. November 17, 1909.)

1. RAILROADS (§ 446*)—INJURIES AT FARM CROSSING—NECESSITY OF SIGNALS.
    A farm road crossing by reason of an embankment and a high fence, was dangerous. The road and crossing were frequently used for traffic, and for three days before the injury to plaintiff's horses, by being struck by a train which approached the crossing without giving any signals, had been used continuously by 28 teams hauling ice, one of which was plaintiff's. Held, that a nonsuit, granted on the theory that defendant was not bound to give any signals at a crossing which was not a public highway, was erroneous, since the jury might have found that defendant had knowledge of the use to which the road was put, placing on it the duty of using ordinary care.
    [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1636, 1637; Dec. Dig. § 446.*]
2. RAILROADS (§ 413*)—FARM CROSSINGS—CARE REQUIRED—ASSENT TO USE.
    If such use of the farm crossing was assented to by defendant, it was tantamount to a license, and imposed upon defendant the duty of exercising ordinary care to safeguard those passing over the crossing.
    [Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1472; Dec. Dig. § 413.*]
    McLennan, P. J., and Robson, J., dissenting.

Appeal from Trial Term, Herkimer County.

Action by Erastus D. Potter against the New York Central & Hudson River Railroad Company for injuries to a team. From a judgment entered on the granting of a nonsuit, plaintiff appeals. Reversed, and new trial granted.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

William A. Rill, for appellant.
C. E. Snyder, for respondent.

SPRING, J. On the 30th day of January, 1908, one Gilbert, in the employ of the plaintiff, was drawing ice with the latter's team and bobs from a pond of water on the farm of one Deimel to a milk station in the city of Herkimer. Twenty-five to 28 teams had been engaged in this work for three days, and the business occupied a week

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

or more. From the main road leading from Herkimer to Middleville there was a road branched off to the south, crossing the defendant's tracks about 150 feet distant from the turn and extending to the dwelling house on the Deimel farm, which was situate on each side of the tracks. This was a road intended primarily for the benefit of the farm, and to enable people to reach the house and other buildings. It had been in use for many years, and the roadway was a beaten path. The road one side of the track passed through a meadow, which the occupant pastured in the summer and fall after haying, and at that time maintained a gate at the crossing to prevent his cattle going on the tracks. At other times of the year the crossing was open and unobstructed, and the gate, when there, was readily removable. There were planks at the crossing, and travel over it at times was considerable. In the summer, aside from the frequent use to and from the Deimel buildings, people went over it in picnic parties to the woods on the farm.

There was a small lake or pond on the farm, and ice had been cut from it in the winter for eight or ten years, and drawn over this road and across the tracks. Gilbert approached this crossing at the time of the accident with a load of ice in cakes piled on a platform rack on the bob sleighs. As he came toward the crossing his view of the coming train was shut off until within 10 feet of the tracks by a high embankment, on top of which was a board fence about 9 feet in height, and erected to keep snow from the track, and the spaces between the boards were only 3 inches. The drifting snow had piled up against this fence. Gilbert, when three rods from the crossing, stopped his team and listened. Hearing nothing, he whipped his team to get up the rise to the crossing, and not until his horses were on the track was he able to see the train, approaching at 30 or 35 miles an hour and only 150 feet distant. He realized he could not cross in front of the train, and backed and turned his horses, but did not get them clear of the track. The train struck one horse, piling the two in a heap, and injuring them, and this action is by the owner of the horses to recover the damages sustained.

The evidence shows that no bell was rung, or whistle sounded, or any warning given of the approaching train, and apparently it was not the custom to give any signal warning at this crossing. The nonsuit was granted on the ground that this road "was not a public highway, and they were not under any obligations to give any notice, except that they could not knowingly injure you." I think that strict rule does not apply to this case. We must take the existing situation. Twenty-five to 28 teams had been going over this crossing for the three days preceding this accident. The ice harvest generally lasted more than a week. The number of teams employed and the short trips made passage over the tracks very frequent. The crossing was a dangerous one. An approaching train from the west could not be seen until the traveler was within 10 feet of the tracks, and his team would then be upon them. The jury may have found from the evidence that the defendant knew or should have known of this open, notorious use of the crossing in the manner common at this time of the

year, and that either the usual signals or some adequate warning should have been given by those in charge of approaching trains. Planks had been maintained at the crossing, and the defendant had acquiesced in the user of this crossing, and especially in hauling ice over it, which use, although temporary, was extensive during the week the work was in progress. This use, assented to by the defendant, was tantamount to a license, and imposed upon it the duty of exercising reasonable care in order to safeguard those passing over this dangerous crossing. Barry v. N. Y. C. & H. R. R. Co., 92 N. Y. 289, 44 Am. Rep. 377; Byrne v. N. Y. C. & H. R. R. Co., 104 N. Y. 362, 10 N. E. 539, 58 Am. Rep. 512; Lamphear v. N. Y. C. & H. R. R. Co., 194 N. Y. 172, 86 N. E. 1115; Foley v. N. Y. C. & H. R. R. Co., 132 App. Div. 506, 117 N. Y. Supp. 956; McCarty v. N. Y. C. & H. R. R. Co., 73 App. Div. 34, 76 N. Y. Supp. 321.

Gilbert was not a trespasser. He was crossing the track lawfully and in a manner long permitted. There may have been no necessity for giving the usual warning signals at this crossing at all times, and we are not holding that the defendant was charged with any such obligation. The object of the signals at a crossing is to warn people intending to cross over of a coming train. If it is a private crossing, and the use known and assented to by the railroad company becomes frequent and extensive, even for a short period, the defendant must in some way warn people when a train approaches. Permitting the use, it was charged with the duty of reasonable precaution to protect Gilbert and the others hauling ice over this crossing. The prevention of injury or death required it. I think the case should have been submitted to the jury.

Judgment reversed, and a new trial granted, with costs to appellant to abide event. All concur, except McLENNAN, P. J., and ROBSON, J., who dissent.

---

(65 Misc. Rep. 62.)

### GEORGE E. LOEFFLER CO. v. SNYDER.

(Supreme Court, Appellate Term. November 12, 1909.)

VENDOR AND PURCHASER (§ 182*)—CONTRACTS OF SALE—PAYMENT IN INSTALLMENTS—RIGHT OF VENDOR.

A contract for the sale of real estate, stipulating for payment in monthly installments, and providing that the agreement shall terminate and all payments thereunder become the property of the vendor on default in any monthly payments, if such default continue for 60 days after maturity, is not terminated, in any event, until 60 days after the failure to pay a monthly installment, and installments accruing prior to the expiration of the 60 days are recoverable.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. § 352; Dec. Dig. § 182.*]

Appeal from Municipal Court, Borough of Manhattan, Ninth District.

